1  VENABLE LLP
   Ryan M. Lapine (SBN 239316)
2     *RMLapine@venable.com*
   Bryan J. Weintrop (SBN 307416)
3     *BJWeintrop@venable.com*
   Adel A. Kelifa (SBN 354224)
4     *AAKelifa@venable.com*
   2049 Century Park East, Suite 2300
5  Los Angeles, CA 90067
   Telephone: (310) 229-9900
6  Facsimile: (310) 229-9901

7  *Attorneys For Plaintiffs*,
   Barry Manilow and Hastings, Clayton
8  & Tucker, Inc. dba Stiletto Entertainment

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BARRY MANILOW, an individual, and HASTINGS, CLAYTON & TUCKER, INC. dba STILETTO ENTERTAINMENT, a Nevada corporation,<br><br>           Plaintiffs,<br><br>      vs.<br><br>HIPGNOSIS SFH I LIMITED, a United Kingdom Limited Company,<br><br>           Defendant. | Case No.:5:24-cv-01844<br><br>**COMPLAINT FOR:**<br><br>   **(1) Breach of Contract;**<br><br>   **(2) Fraud and Fraudulent Misrepresentation;**<br><br>   **(3) Negligent Misrepresentation;**<br><br>   **(4) Declaratory Relief**<br><br>**[DEMAND FOR A JURY TRIAL]** |

COMPLAINT

Plaintiffs Barry Manilow and Hastings, Clayton & Tucker, Inc. dba Stiletto Entertainment ("Stiletto" and collectively "Plaintiffs") for their Complaint against defendant Hipgnosis SFH I Limited ("Hipgnosis" or "Defendant") allege as follows:

## NATURE OF THE ACTION

1. This case arises from Defendant's refusal to honor the purchase terms it agreed to through that certain Music Catalogue Acquisition Agreement (the "MCAA") whereby it purchased certain artist royalties of world-renowned, multi-platinum recording artist Barry Manilow from Plaintiffs.[1]

2. It also results from Hipgnosis, through its agent Merck Mercuradis, misrepresenting its experience, skill, and expertise to fraudulently induce Plaintiffs to enter into the MCAA.

3. As consideration for the purchase of certain of Manilow's artist royalties, which included, among other assets, all income and revenues earned from the masters for an agreed selection of many of Manilow's musical library, Defendant agreed to pay Plaintiffs: (1) an upfront one-time payment of $7,500,000.00; (2) an additional Purchase Price payment of $750,000.00 if the cash income received by Defendant from its share of income based on the purchased catalogue ("Share of Assets") reached certain benchmarks; and (3) an additional Purchase Price payment of $750,000.00 if the cash income received by Defendant from its share of income based on the Share of Assets reached a second benchmark.

4. The benchmarks that entitle Plaintiff to the two additional Purchase Price payments of $750,000.00 have been met; however, Defendants have abjectly refused to pay Plaintiffs the additional Purchase Price payments called for by the MCAA, instead engaging in a prolonged game of cat and mouse to avoid that obligation.

---

[1] The MCAA also lists an entity known as Manilow Productions, Inc. as a party. Such an entity does not exist. It was listed on aged contracts with Arista Records, but dissolved many years prior to the facts at issue in this matter.

1
COMPLAINT

5. This lawsuit results and seeks redress therefrom. It also seeks redress from the material misrepresentations Hipgnosis made to induce Plaintiffs to enter into the MCAA.

## PARTIES

6. Stiletto is a Nevada corporation with its principal place of business in Culver City, California.

7. Barry Manilow writes the songs that make the whole world sing. He resides in California.

8. Defendant Hipgnosis is, on information and belief, a British corporate entity domiciled in the United Kingdom where its principal place of business is located.

## JURISDICTION AND VENUE

9. The Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a). The amount in controversy exceeds $75,000 exclusive of interest and costs.

10. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the MCAA was generally negotiated and entered into by Plaintiffs in Los Angeles County, California, with Hipgnosis making its representations within and to residents of this District.

11. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) because Defendant is subject to this Court's personal jurisdiction due to the forum selection clause contained in the MCAA, which provides that "any claims made by [Plaintiffs] against Hipgnosis related to the Purchase Price may be brought by [Plaintiffs] in the courts of Los Angeles, California . . . and solely in connection with such claims, Hipgnosis hereby agrees to submit to the jurisdiction of the courts located in Los Angeles, California."

## FACTUAL BACKGROUND

12. Hipgnosis is in the business of purchasing the publishing rights of acclaimed artists such as Manilow.

13. When Hipgnosis first pursued a business relationship with Plaintiffs, Manilow was already under contract with a renowned international company for his publishing rights – they were not available for sale.

14. Hipgnosis therefore proposed to purchase artist royalties from Plaintiffs for certain of Manilow's hits.

15. Via its agent Merck Mercuradis, Hipgnosis induced Plaintiffs to enter into the contract by promising that its Chief Catalogue Officer and its various other purportedly experienced music industry employees and officers would pursue and achieve album reissues, special compilations, and licensing agreements in commercials, films, television and other media. It pledged to do so by leveraging its purported expertise, experience, and bench strength through its large staff. Hipgnosis promised to provide a full-time, dedicated team of qualified industry professionals to devote themselves to optimizing the value of the royalties they purchased.

16. This would have ostensibly benefited Plaintiffs by considerably increasing the value of the retained publishing royalties beyond expected increases given, *inter alia*, Manilow's longstanding Las Vegas residency and successful touring schedule.

17. Plaintiffs and Defendant entered into the MCAA on or about March 20, 2020, having to ultimately backdate it as, in a sign of things to come, Mercuradis lacked the corporate authority he represented he possessed, causing the deal execution to stagnate and delay.

18. Plaintiffs contracted with Hipgnosis in reliance on its representations that it would devote its industry skill, experience, and expertise to promote Manilow's catalogue of music. To that end, the MCAA provided that Hipgnosis would "meaningfully consult with Barry Manilow personally with respect to all synchronization licenses, coupling, and major exploitation licenses for the Subject Masters and any marketing/advertising campaigns for the Subject Masters which are designed and implemented by Hipgnosis."

19. None of the promised marketing or promotion ever materialized. It has *never* consulted with Manilow or even attempted to so consult. It became clear that Hipgnosis made profoundly false promises. It lacked the skill, experience, and expertise to optimize the Manilow hits in play under the contract.

**Hipgnosis' Failure to Remit Additional Purchase Price Payments**

20. The MCAA generally contemplated Defendant's purchase of certain items within Manilow's musical catalogue from Plaintiffs. Specifically, Defendant purchased the rights to Plaintiffs' "worldwide income, revenue, earnings and financial interests of every type whatsoever from any and all sources and payors, in perpetuity pertaining to the masters recordings (audio and audio-visual, released and/or unreleased) listed on Schedule A annexed hereto and made a part hereof and all re-recordings heretofore or hereafter made by [Plaintiffs] of the musical compositions contained on the aforesaid Schedule A recordings" (defined by the MCAA as "Subject Masters") subject to certain exclusions.

21. In consideration for purchase of the Subject Masters, Defendant agreed to pay Plaintiffs the following Purchase Price:

    a. An initial purchase price payment of $7,500,000.00

    b. An additional purchase price payment of $750,000.00 if the cash income received by Hipgnosis from Hipgnosis' Share of the Assets [*i.e.*, income based on the Subject Masters] increased by at least ten (10%) percent year-on-year compounding for each of Years 1 through 3 from purchase; and

    c. An additional purchase price payment of $750,000.00 if the cash income received by Hipgnosis from Hipgnosis' Share of the Assets increased by at least ten (10%) percent year-on-year compounding for each of Years 1 through 4 from purchase.

22. The MCAA further provides that: "Year 1 means the first full twelve (12) month period following the Closing Date; Year 2 means the second full twelve (12)

month period following the Closing Date; Year 3 means the third full twelve (12) month period following the Closing Date; and Year 4 means the fourth full twelve (12) month period following the Closing Date."

23. The MCAA does not provide a benchmark amount that was to dictate the amount necessary to qualify as a 10% increase for a year-on-year basis for Year 1 from some prior timeframe. Rather, it was understood that the amount earned by Defendant in connection with Year 1 would dictate the amount necessary to qualify for a 10% increase going forward for Years 2 through 4.

24. Plaintiffs satisfied the necessary conditions to receive the two additional $750,000.00 purchase price payments based on the income received by Defendants under the MCAA during Years 1 through 4. Specifically, in Year 1, Defendants earned $404,388.00 in cash income from the Subject Masters. In Year 2, Defendants earned $539,822.00 in cash income from the Subject Masters, which exceeded the 10% increase amount based on Year 1 of $444,826.80 by $94,995.20. In Year 3, Defendants earned $493,309.00, which exceeded the 10% increase amount based on Year 2 of $489,309.48 by $3,999.52. And, in Year 4, Defendants earned $550,383.00, which exceeded the 10% increase amount based on Year 3 of $538,240.43 by $12,142.57.

25. Despite satisfying the conditions necessary to trigger both of the additional $750,000.00 purchase price payments, including by, *inter alia*, complying with all other contractual provisions except insofar as excused by Defendant's conduct, Defendant has refused to pay Plaintiffs the additional purchase price payments. It is unclear if Defendant is just willfully violating the MCAA or if alternately it lacks the resources to make good on its contractual commitments.

**Hipgnosis Fraudulently Induced Plaintiffs to Enter the MCAA**

26. Aside from not paying Plaintiffs two additional Purchase Price payments under the MCAA when they became due, Hipgnosis also failed by any measure to deliver on its promises, demonstrating repeatedly it lacked the skill and experience it falsely represented it possessed.

27. Indeed, the optimization plans Hipgnosis presented to Plaintiffs after executing the MCAA were inept and incompetent to a degree that would have been comical, had they not detrimentally impacted Plaintiffs. For example, Hipgnosis promised to "transcend[] into a new generation" through social media by (1) creating TikTok content from archived footage, reactions to fan videos and a "Copacabana dance trend"; (2) launching a "Karaoke channel" on YouTube "with fun animations;" (3) launching a "Giphy pack and stickers with iconic imagery" on Instagram, among others. Not to mention Hipgnosis' NFT aspirations involving the "Nifty's" platform, with assurances that "airdropping additional perks" to the original NFT such as a concert ticket "really builds the hype around an NFT."

28. Hipgnosis' plan also included a potential partnership with Urban Outfitters to market Copacabana vinyl records, marketing "Copacabana Drinks Kits" and pre-mixed drinks, launching a series of archived Manilow concerts accessible through Amazon Prime, launching a digital merchandise store with Tour Programs for Manilow's 2002 tour, and creating covers and remixes for "all major playlist group[s]."

29. Hipgnosis did none of these things. It also did not pursue and achieve album reissues, special compilations, and licensing agreements in commercials, films, television and other media, lacking the skill, experience, and industry connections to do so.

30. Hipgnosis also proved to be a remarkably unstable organization. Its Chief Catalogue Officer, Amy Thompson, exited in September 2022 and was not replaced. Various other staff exited in what became a revolving door. The other purported industry experts exited the company, including Mercuradis.

31. Had Plaintiffs any idea that Mercuradis' statements about Hipgnosis' skill, experience, and bandwidth were simply not true, they would not have contracted with Hipgnosis and would have instead sought out opportunities with a competent business partner.

# FIRST CLAIM

## (Breach of Contract)

32. Plaintiffs incorporate by reference the allegations contained in the paragraphs above, as though fully set forth herein.

33. Plaintiffs and Defendant entered into the MCAA with a March 20, 2020 effective date.

34. Plaintiffs have fully performed all conditions, covenants, obligations and promises required on their part to be performed in accordance with the terms of the MCAA, except insofar as Plaintiffs have been excused from having to perform such conditions, covenants, obligations and promises by Defendant's breaches of the contract, or otherwise by operation of law.

35. Defendant has willfully breached, or otherwise failed and refused to perform its obligations under the contract. Specifically, Defendant agreed to provide additional purchase price payments to Plaintiffs in the amount of $750,000.00 if: (a) the cash income received by Defendant from its Share of the Assets [i.e., income based on the Subject Masters] increased by at least ten (10%) percent year-on-year compounding for each of Years 1 through 3 from purchase; and (b) if the cash income received by Defendant from Defendant's Share of the Assets increased by at least ten (10%) percent year-on-year compounding for each of Years 1 through 4. Despite Defendant earning sufficient cash income to satisfy the above conditions, Defendant has refused to pay Plaintiffs the additional $1,500,000.00 purchase price payments.

36. Defendant's wrongful conduct alleged herein constitutes a material breach of the MCAA.

37. As a direct and proximate result of Defendant's material breaches of the MCAA Plaintiffs have suffered damages in the amount of at least $1,500,000.00 plus pre-judgment interest and attorneys' fees in an amount to be proven at trial.

# SECOND CLAIM

## (Fraud and Fraudulent Misrepresentation)

38. Plaintiffs incorporate by reference the allegations contained in the paragraphs above, as though fully set forth herein.

39. During pre-contractual negotiations that ultimately bled into March of 2020, Hipgnosis falsely represented to Plaintiffs through its agents, including and primarily Merck Mercuradis, that it had an extensive staff of experienced and skilled music industry executives prepared to implement a range of strategies to optimize the royalties received from Manilow's musical catalogue through active promotion, including but not limited to album reissues, special compilations and licensing agreements in commercials, films, television and other media.

40. Mercuradis and other Hipgnosis agents knowingly or recklessly made these false and material representations to Plaintiffs. They knew that Hipgnosis lacked the expertise, industry connections, organizational stability and sufficient personnel to follow through on these promises.

41. Hipgnosis made these false representations intending that Plaintiffs act upon them by entering into the MCAA with Hipgnosis, rather than any number of competent and experienced companies that could and would have optimized Manilow's iconic hits to increase royalty payments.

42. Plaintiffs reasonably and justifiably relied upon Hipgnosis' representations that if they sold certain of their classic and world-renowned musical repertoire to Hipgnosis, that it would safeguard that legacy by establishing a dedicated team that would work to optimize its value, thereby increasing the payments from the royalties excluded from the MCAA. Hipgnosis' false representations were material to Plaintiffs' decision to enter the MCAA with Hipgnosis.

43. Hipgnosis not only failed to make good on its promises to market and promote Manilow's music, but it lacked skilled and competent personnel to do so. It did not devote an experienced team to pursue this goal, nor could it retain the personnel

it did have on a long-term basis. In its sole attempt to pitch strategies to Plaintiffs to stimulate public engagement with the Subject Masters in April 2021, Hipgnosis' Chief Catalog Officer Amy Thomson resorted to suggesting "a Copacabana dance trend," a YouTube "Karaoke channel with fun animations" and an Instagram "Giphy pack and stickers with iconic imagery and lyrics." Hipgnosis never launched any of these campaigns, nor did it pursue—as promised—more conventional strategies such as reissuing albums, special compilations and seeking licensing agreements in commercials, films, television and other media. Thomson left Hipgnosis in September 2022 and was not replaced.

44. Hipgnosis' failure to implement *any* of the promised strategies to promote Manilow's musical catalogue during Years 1 through 4 further reveals Hipgnosis' bad faith. Indeed, the MCAA provided for additional purchase price payments if the cash income received by Hipgnosis from the Subject Masters rose by at least ten (10%) percent for Years 1 through 3 and Years 1 through 4. Following through on its promises to promote the Subject Masters therefore had the potential to further increase the yearly income received by Hipgnosis during those critical years to an amount sufficient to trigger the additional purchase price payments to Plaintiffs. Hipgnosis did not carry out a single one of its touted promotional strategies; upon information and belief, it did nothing at all in order to keep the cash income below the levels required to meet the condition precedent for the additional purchase price payments to Plaintiffs. When this attempt proved unsuccessful, it refused to pay those additional purchase price payments.

45. Plaintiffs acted to their detriment in entering the MCAA with Hipgnosis, rather than a company with the experience and promotional savvy to optimize the value of the royalties beyond expected increases and are entitled to actual damages in an amount according to proof.

46. Hipgnosis' acts were oppressive, fraudulent or malicious such that punitive damages should issue.

## THIRD CLAIM

### (Negligent Misrepresentation)

47. Plaintiffs incorporate by reference the allegations contained in the paragraphs above, as though fully set forth herein.

48. During pre-contractual negotiations that stretched into March of 2020, Hipgnosis negligently misrepresented to Plaintiffs through its agents, including Merck Mercuradis, that it had an extensive staff of experienced and skilled music executives prepared to implement a range of strategies to optimize the royalties received from Manilow's musical catalogue through active promotion, including but not limited to album reissues, special compilations and licensing agreements in commercials, films, television and other media.

49. Hipgnosis and its agents, including Mercuradis, had a duty to use reasonable care to ensure that their representations were correct.

50. When Mercuradis and other Hipgnosis agents negligently made these material misrepresentations to Plaintiffs, they had no reasonable grounds to believe that Hipgnosis had the expertise, industry connections, organizational stability, and sufficient personnel to follow through on these promises.

51. Hipgnosis made these negligent misrepresentations intending that Plaintiffs act upon them by entering into the MCAA with Hipgnosis, rather than any number of competent and experienced companies that could and would have optimized Manilow's iconic hits to increase royalty payments.

52. Plaintiffs reasonably and justifiably relied upon Hipgnosis' misrepresentations that if they sold certain of their classic and world-renowned musical repertoire to Hipgnosis, that it would safeguard that legacy by establishing a dedicated team that would work to optimize its value, thereby increasing the payments from the royalties excluded from the MCAA. Hipgnosis' negligent misrepresentations were material to Plaintiffs' decision to enter the MCAA with Hipgnosis.

53. Hipgnosis not only failed to make good on its promises to market and promote Manilow's music, but it lacked skilled and competent personnel to do so. It did not devote an experienced team to pursue this goal, nor could it retain the personnel it did have on a long-term basis. In its sole attempt to pitch strategies to Plaintiffs to stimulate public engagement with the Subject Masters in April 2021, Hipgnosis' Chief Catalog Officer Amy Thomson resorted to suggesting "a Copacabana dance trend," a YouTube "Karaoke channel with fun animations" and an Instagram "Giphy pack and stickers with iconic imagery and lyrics." Hipgnosis never launched any of these campaigns, nor did it pursue—as promised—more conventional strategies such as reissuing albums, special compilations and seeking licensing agreements in commercials, films, television and other media. Thomson left Hipgnosis in September 2022 and was not replaced.

54. Plaintiffs acted to their detriment in entering the MCAA with Hipgnosis, rather than a company with the experience and promotional savvy to optimize the value of the royalties beyond expected increases and are entitled to actual damages in an amount according to proof.

## FOURTH CAUSE OF ACTION

**(Declaratory Relief)**

55. Plaintiffs incorporate by reference the allegations contained in the paragraphs above, as though fully set forth herein.

56. An actual controversy exists between Plaintiffs and Defendant regarding interpretation of the provisions regarding the purchase price contained in the MCAA. Specifically, Plaintiffs maintain that because the MCAA is silent as to a set benchmark amount necessary to achieve a 10% year-on-year increase as to Year 1, and the parties never contemplated one, the amount earned by Defendant in connection with Year 1 is the amount which dictates whether the 10% year-on year increase has been met for Years 2 through 4. By contrast, Defendant maintains that some unspecified amount not contemplated by the MCAA from some earlier unspecified time-period, and not

agreed to by the parties at the time of execution, is the benchmark by which the 10% year-on-year increase as to Year 1 is determined.

57. Plaintiffs seek a judicial declaration that they have achieved the conditions precedent necessary to trigger the additional $750,000.00 purchase price payments called for under the MCAA by virtue of Defendants earning cash income in amounts in excess of that called for by the MCAA to trigger the additional payments.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1. An award of actual and compensatory damages against Defendant for all amounts owed according to proof at trial, as well as all interest and default interest;
2. A judicial declaration that Plaintiffs have satisfied the necessary conditions to obtain the additional $1,500,000.00 in purchase price under the MCAA;
3. All costs of suit incurred herein, including attorneys' fees;
4. Punitive damages in an amount according to proof;
5. Pre- and post-judgment interest at the maximum legal rate; and
6. Any and all further relief which the Court deems just and proper.

DATED: August 28, 2024

Respectfully submitted,
**VENABLE LLP**

 /s/ Ryan M. Lapine
Ryan M. Lapine
Bryan J. Weintrop
Adel A. Kelifa

*Counsel for Plaintiffs*
*Barry Manilow, and Hastings, Clayton & Tucker, Inc. dba Stiletto Entertainment*

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request a trial by jury on all issues triable by a jury.

DATED: August 28, 2024

Respectfully submitted,
**VENABLE LLP**

 /s/ Ryan M. Lapine
Ryan M. Lapine
Bryan J. Weintrop
Adel A. Kelifa

*Counsel for Plaintiffs*
*Barry Manilow, and Hastings, Clayton & Tucker, Inc. dba Stiletto Entertainment*